[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13113

_____

D.C. Docket No. 5:17-cr-00062-MTT-CHW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROOSEVELT COATS, III,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(August 12, 2021)

Before MARTIN, NEWSOM, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Defendant Roosevelt Coats pled guilty to and was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  The district court sentenced Defendant to serve 235 months in prison pursuant to the Armed Career Criminal Act ("ACCA"), which applies when a defendant who is convicted of violating § 922(g) has three prior convictions for a "serious drug offense" or a "violent felony."  The court applied the ACCA based in part on Defendant's 2003 Georgia burglary conviction, which the court determined was a violent felony for purposes of the ACCA.  Defendant's sentence also reflected the district court's denial of an acceptance-of-responsibility reduction to his recommended sentencing guidelines range based on his obstructive conduct preceding his guilty plea.

On appeal, Defendant argues that his burglary conviction does not satisfy the ACCA's definition of a violent felony and that, due to extraordinary circumstances, he was entitled to an acceptance-of-responsibility reduction despite his obstructive conduct.  He also argues for the first time on appeal that his conviction should be vacated because his guilty plea was constitutionally invalid pursuant to the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019).  We affirm Defendant's conviction because any *Rehaif* error was nonprejudicial; we affirm Defendant's sentence because we agree with the district court that his 2003 Georgia burglary conviction qualifies as a violent felony under

2

the ACCA, and we conclude that the district court did not clearly err in refusing to award an acceptance-of-responsibility reduction.

## BACKGROUND

Defendant was arrested in 2017 on state drug and weapons charges after making several controlled drug sales to a confidential informant ("CI"). The transactions between Defendant and the CI were monitored through a recording device the CI was wearing. In one of the recorded transactions, Defendant sold the CI a rifle for $100. During their subsequent investigation, police discovered that Defendant had provided the CI with, and was in possession of, additional guns. Defendant was a convicted felon at the time of the transactions with the CI and the investigation.

Following his arrest, Defendant was housed at the Wilkinson County, Georgia jail while he awaited trial on the state charges. The CI who assisted in the investigation of Defendant was in custody at the same facility. At some point during his incarceration, Defendant gained access to the CI and assaulted him by punching him in the face. That incident resulted in additional state charges against Defendant for battery and influencing a witness, to which he pleaded guilty.

A federal grand jury subsequently indicted Defendant on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The indictment alleged that "having been convicted of a crime punishable by

3

imprisonment for a term exceeding one year[,]" Defendant "did knowingly possess a firearm in and affecting interstate and foreign commerce, to wit: one (1) Marlin, Glenfield model 75C, .22 caliber rifle."

Defendant pled guilty without a plea agreement. At the plea hearing, Defendant confirmed his understanding that, by entering a guilty plea, he would be giving up his trial rights, as described by the court. After reading the indictment verbatim, the Government explained:

> At trial we would have to prove that he possessed the firearm -- that he knowingly possessed the firearm affecting -- in or affecting interstate and foreign commerce and that prior to this possession that he had been convicted of a felony crime that's punishable by a term of imprisonment of more than one year.

Defendant informed the court that he had reviewed the indictment with counsel and confirmed that he understood the charge, stating that he had no questions. As to the factual basis for the plea, defense counsel stipulated that "Mr. Coats did knowingly possess a firearm and that it was in and affecting interstate commerce and that he does have a prior felony conviction." Defendant said he wished to plead guilty of his own free will because he was in fact guilty, and the court accepted his plea, finding it knowing and voluntary.

A probation officer prepared a presentence investigation report ("PSR"), which concluded that Defendant qualified for an ACCA enhancement based on his prior convictions for possession of marijuana with intent to distribute, burglary,

4

and sale of cocaine. The PSR assigned Defendant a base offense level of 20, and it recommended a 2-level increase for the number of firearms involved in the offense and a 2-level increase for obstruction of justice, with no acceptance-of-responsibility reduction under § 3E1.1 of the Sentencing Guidelines as a result of the jail-house assault on the CI. As noted, the PSR also determined that Defendant should be sentenced under the ACCA based on his two prior serious drug offense convictions and his 2003 Georgia burglary conviction, which the PSR categorized as a violent felony. The ACCA enhancement and Defendant's criminal history category of VI resulted in an adjusted offense level of 33 and a recommended sentencing guidelines range of 235 to 293 months.

Defendant objected to the PSR, arguing that his Georgia burglary conviction did not satisfy the ACCA's definition of a violent felony and that he should have received an acceptance-of-responsibility reduction despite his obstructive conduct with respect to the CI. In support of his ACCA objection, Defendant submitted a copy of his indictment in the Georgia burglary case showing that he had been charged as a "party to" the burglary. Specifically, the indictment charged that "ROOSEVELT COATS and JADE HILL, acting together and as parties to the crime" committed "the offense of BURGLARY (O.C.G.A. § 16-7-1)." According to Defendant, his conviction as a party to the crime of Georgia burglary did not satisfy the ACCA's definition of a violent felony because Georgia law defining

5

who can be a party to a crime is broader than the generic version of accomplice liability. As to acceptance of responsibility, Defendant argued that he should receive the reduction because his obstructive conduct preceded his federal indictment for the § 922(g) offense. Defendant did not, in his objections, challenge the PSR's descriptions of his criminal history.

The district court overruled Defendant's ACCA objection and held that his 2003 Georgia burglary conviction qualified as a violent felony for purposes of the ACCA. As to Defendant's acceptance-of-responsibility objection, the court found there were no "extraordinary circumstances" warranting the reduction, given Defendant's obstructive conduct. Having rejected Defendant's ACCA and other sentencing arguments, the court accepted the PSR's recommendations and sentenced Defendant to serve 235 months in prison.

On appeal, Defendant asserts that his conviction should be vacated because his guilty plea was constitutionally invalid under the Supreme Court's decision in *Rehaif v. United States*, 135 S. Ct. 2191 (2019). Defendant argues further that he should not have been sentenced under the ACCA because his 2003 Georgia burglary conviction does not qualify as a violent felony under the ACCA. Specifically, Defendant argues that he was convicted of being a party to the burglary under a Georgia statute that provides for broader criminal liability than generic accomplice law. Finally, Defendant argues he is entitled to a three-point

reduction for acceptance of responsibility because of the "extraordinary circumstance" that his obstructive conduct preceded his guilty plea.

## DISCUSSION

### I.    Defendant's *Rehaif* Challenge

Section 922(g) of Title 18 of the United States Code prohibits nine categories of individuals, including felons like Defendant, from possessing firearms. Section 924(a)(2) provides that "[w]hoever knowingly violates [18 U.S.C. § 922(g)] shall be . . . imprisoned not more than 10 years." 18 U.S.C. § 924(a)(2). Defendant pled guilty to violating § 922(g)(1), which criminalizes possession of a firearm by any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." *Id.* § 922(g)(1).

When the district court accepted Defendant's guilty plea, the law of this Circuit provided that a § 922(g) conviction for being a felon in possession of a firearm required proof that the defendant knowingly possessed a firearm, but it did not require proof that the defendant knew he was a convicted felon. *United States v. Jackson*, 120 F.3d 1226, 1229 (11th Cir. 1997), *abrogation recognized in United States v. Reed*, 941 F.3d 1018, 1020–21 (11th Cir. 2019). That changed while this case was pending on appeal, when the Supreme Court held in *Rehaif v. United States* that the word "knowingly" in § 924(a)(2) applies both to the defendant's

conduct and to the defendant's status. *Rehaif v. United States*, 139 S. Ct. 2191, 2194 (2019). Thus, "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both [1] that the defendant knew he possessed a firearm" (the knowledge-of-possession element), and "[2] that he knew he belonged to the relevant category of persons barred from possessing a firearm" (the knowledge-of-status element). *Id.* at 2200. Translated: when a defendant is charged with being a felon in possession of a firearm under § 922(g)(1), the knowledge-of-status element requires proof that at the time he possessed the firearm he was aware he had a prior conviction for "a crime punishable by imprisonment for a term exceeding one year." *See id.* (quoting 18 U.S.C. § 922(g)(1)).

Relying on *Rehaif*, Defendant argues for the first time on appeal that his guilty plea was constitutionally invalid because no one informed him of § 922(g)(1)'s knowledge-of-status element. He contends that he could not have entered a knowing and voluntary guilty plea without an understanding that knowledge of his felon status was a prerequisite for conviction. Accordingly, he asks that we vacate his conviction.[1]

---

[1] Although Defendant also asserts that we should remand for the district court to dismiss the indictment based on the *Rehaif* error, he abandons any challenge to the indictment by failing to develop an argument that the indictment was invalid. *See United States v. Corbett*, 921 F.3d 1032, 1043 (11th Cir. 2019) (noting that a defendant abandons issues raised "in a perfunctory manner without supporting arguments and authority" (quotation marks omitted)).

When, as here, a defendant argues for the first time on appeal that his guilty plea was constitutionally invalid because it was not knowing and voluntary, we review only for plain error, using a four-prong inquiry. *United States v. Moriarty*, 429 F.3d 1012, 1018 (11th Cir. 2005). To establish plain error, a defendant must show that (1) there was an error, (2) the error was plain, and (3) the error affects substantial rights. *Id.* at 1019. If these three conditions are met, we have discretion to recognize an unpreserved error but only if (4) the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration accepted) (quotation marks omitted).

As an initial matter, we agree with Defendant that, given the Supreme Court's subsequent decision in *Rehaif*, acceptance of the guilty plea by the district court must now be considered to be an error. This is so because given the fact that a guilty plea involves the relinquishment of several constitutional rights and privileges, it must be entered voluntarily and knowingly. *United States v. Presendieu*, 880 F.3d 1228, 1238 (11th Cir. 2018). And a guilty plea cannot be deemed "voluntary in the constitutional sense" unless "the defendant received real notice of the true nature of the charge against him." *Id.* (quotation marks omitted). As a requirement for receiving "real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process," a defendant must understand the crime's "essential elements." *Bousley v. United*

*States*, 523 U.S. 614, 618–19 (1998) (quotation marks omitted).  This means that prior to tendering a plea of guilty, the defendant must receive "a description of the 'critical elements' of the charged offense, such as the element defining the requisite intent."  *Gaddy v. Linahan*, 780 F.2d 935, 945 (11th Cir. 1986).

We now know that because Defendant was not informed of § 922(g)'s essential *mens rea* requirement, the district court erred in accepting Defendant's guilty plea.  Of course, when Defendant entered his guilty plea, neither the court, nor the Government, nor defense counsel were aware that a "knowing" violation of § 922(g) required proof that Defendant knew he was a convicted felon when he possessed the firearm.  That news was later delivered by the Supreme Court in *Rehaif*.  It is therefore unsurprising that the Government's description of the charge and defense counsel's stipulated factual proffer mirrored the indictment, which alleged merely that Defendant (1) was a felon who (2) knowingly possessed a firearm, but did not specify that Defendant also had knowledge of his felon status. *Rehaif*, however, clarified that its newly discerned knowledge-of-status element is critical to a § 922(g) charge because that element alone "separate[s] wrongful from innocent acts" of firearm possession.  *Rehaif*, 139 S. Ct. at 2197.  "Without knowledge of that status," the Court explained, "the defendant may well lack the intent needed to make his behavior wrongful."  *Id.*  Because Defendant lacked notice of the essential elements of his charge, as required to enter a constitutionally

10

valid guilty plea, the court erred in accepting his plea. *See Bousley*, 523 U.S. at 618–19 (holding that a habeas petitioner's guilty plea would be "constitutionally invalid" if he could prove that "neither [the petitioner], nor his counsel, nor the court correctly understood the essential elements of the crime with which [the petitioner] was charged").

The district court's error in accepting Defendant's plea was also plain. *See Pardue v. Burton*, 26 F.3d 1093, 1096 (11th Cir. 1994) ("Because a plea of guilty 'is a conviction,' anything less than an 'affirmative showing' that it was made intelligently and voluntarily amounts to plain error."). The Supreme Court and this Court have long held that a trial court errs in accepting a guilty plea if it fails to ensure that the defendant understands the critical elements of a charge against him. *See, e.g.*, *Bousley*, 523 U.S. at 616, 618–19 (holding that a petitioner, who pled guilty to "using" a firearm in relation to a drug-trafficking crime before the Supreme Court had held that "using" required "active employment of the firearm," entered an unintelligent plea if no one explained the "using" element to him); *Gaddy*, 780 F.2d at 945–46 (holding that a one-sentence indictment that used legal terms of art, such as "murder" and "malice aforethought," was insufficient to show that the petitioner understood the elements of malice murder). And *Rehaif* establishes that a defendant's knowledge of his status as an individual prohibited from possessing firearms is a critical element of a § 922(g) charge. *Rehaif*, 139 S.

11

Ct. at 2197. Accordingly, Defendant has satisfied his burden to show that the error was plain. *Cf. Reed*, 941 F.3d at 1021 (holding that "*Rehaif* made plain" errors in an indictment and in jury instructions, which omitted the § 922(g)'s knowledge-of-status element).[2]

As to the third prong of plain-error review, which requires the defendant to show that the error affected substantial rights—in other words, to demonstrate prejudice—Defendant contends that a prejudice showing should not be required because the *Rehaif* error was structural. When a defendant fails to object to a constitutional error, there are two standards against which we can gauge the error. *See United States v. Margarita Garcia*, 906 F.3d 1255, 1263 (11th Cir. 2018). Under the standard most often used to gauge the impact of an error on substantial rights, a defendant must show that the error changed the outcome of the proceeding. *Id.* at 1267. As to those rare instances when a defendant can establish that the error was "structural," however, we "eliminate the requirement to establish actual prejudice" because we conclude that such errors necessarily affect substantial rights. *Id.* at 1264; *see United States v. Marcus*, 560 U.S. 258, 263

---

[2] In reaching this conclusion, we join several of our sister circuits, which have likewise held that *Rehaif* errors at the plea stage are plain. *See, e.g.*, *United States v. Austin*, 991 F.3d 51, 59 (1st Cir. 2021); *United States v. Balde*, 943 F.3d 73, 97 (2d Cir. 2019); *United States v. Lockhart*, 947 F.3d 187, 196 (4th Cir. 2020); *United States v. Montgomery*, 974 F.3d 587, 590–91 (5th Cir. 2020); *United States v. Nebinger*, 987 F.3d 734, 738 (7th Cir. 2021); *United States v. Jawher*, 950 F.3d 576, 579 (8th Cir. 2020); *United States v. Trujillo*, 960 F.3d 1196, 1201 (10th Cir. 2020).

(2010) ("[W]e have noted the possibility that certain errors, termed 'structural errors,' might 'affect substantial rights' regardless of their actual impact on an appellant's trial." (alteration accepted)).  "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees," *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017), which are necessary for a proceeding to "reliably serve its function as a vehicle for determination of guilt or innocence," *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991) (quotation marks omitted).  Accordingly, a structural error's "defining feature" is that it "defies analysis by harmless error standards" because "it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *Weaver*, 137 S. Ct. at 1907–08 (alterations accepted) (quotation marks omitted).

Review for prejudice "acts as an adequate safeguard" in most situations. *Margarita Garcia*, 906 F.3d at 1264–65.  Thus, we have applied the structural-error doctrine and "presume[d] prejudice" only in "rare circumstances." *Id.*; *Neder v. United States*, 527 U.S. 1, 8 (1999) (noting that the Supreme Court has "found an error to be structural, and thus subject to automatic reversal, only in a very limited class of cases" because "most constitutional errors can be harmless" (quotation marks omitted)).

13

In arguing that we should automatically vacate his conviction under the structural-error doctrine, Defendant relies on the Fourth Circuit's decision in *United States v. Gary*, which held that a *Rehaif* error affecting the knowing and voluntary nature of a guilty plea is structural. *United States v. Gary*, 954 F.3d 194, 207 (4th Cir. 2020). While this case was pending on appeal, however, the Supreme Court granted certiorari to review *Gary* and consolidated the case with *Greer*, another *Rehaif*-related appeal involving erroneous jury instructions. *Greer v. United States*, 141 S. Ct. 2090 (2021). In *Greer*, the Supreme Court reiterated that constitutional errors are treated as structural only in exceptional circumstances and that, as a general rule, a defendant seeking reversal of a conviction must show prejudice under a plain-error standard of review. *Id.* at 2100. Relying on its prior holding that "the omission of a single element from jury instructions is not structural" because it does not "*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," the Court concluded that "[a] *Rehaif* error in jury instructions is therefore not structural." *Id.* (emphasis in original) (quotation marks omitted) (citing *Neder*, 527 U.S. at 7–10). "And it follows," the Court reasoned, "that a *Rehaif* error in a plea colloquy is likewise not structural" because "[t]he omission of that *mens rea* element from a plea colloquy—like the omission of that *mens rea* element from jury instructions—does not affect the entire framework within which the proceeding occurs." *Id.*

14

Accordingly, the Court concluded that "*Rehaif* errors fit comfortably within the general rule that a constitutional error does not automatically require reversal of a conviction." *Id.* (quotation marks omitted).

Under *Greer*, therefore, the third prong of the plain-error test requires a defendant to show that a *Rehaif* error affected his substantial rights. *Id.* at 2097. In the context of a challenge to a guilty plea, this burden requires that a defendant "show[] that, if the District Court had correctly advised him of the *mens rea* element of the offense, there is a reasonable probability that he would not have pled guilty." *Id.* (quotation marks omitted).

As any defendant who was convicted pre-*Rehaif* under § 922(g)(1) was necessarily a felon when he possessed a firearm, the Supreme Court acknowledged in *Greer* that carrying this burden will typically be an "uphill climb." *Id.* As Justice Kavanaugh noted, the reason why this is so is "simple": "If a person is a felon, he ordinarily knows he is a felon." *Id.* Why? Because "[f]elony status is simply not the kind of thing that one forgets." *Id.* (quotation marks omitted). Moreover, "[t]hat simple truth is not lost upon juries," who "will usually find that a defendant *knew* he was a felon based on the fact that he *was* a felon." *Id.* (emphasis in original).

Given that a prior felony conviction constitutes "substantial evidence" that a defendant knew he was a felon, "a *Rehaif* error is not a basis for plain-error relief

15

unless the defendant first makes a sufficient argument or representation on appeal that he would have presented evidence at trial that he did not in fact know he was a felon." *Id.* at 2097–98, 2100. "When a defendant advances such an argument or representation on appeal, the court must determine whether the defendant has carried the burden of showing a 'reasonable probability' that the outcome of the district court proceeding would have been different." *Id.* at 2100. Absent such an argument or representation, however, a defendant who pled guilty necessarily fails to show a reasonable probability that he would have gone to trial but for the *Rehaif* error. *See id.* at 2098 (holding that the defendants could not show prejudice because, "[i]mportantly, on appeal, neither Greer nor Gary has argued or made a representation that they would have presented evidence at trial that they did not in fact know they were felons when they possessed firearms").

Here, we conclude that Defendant has not carried his burden to show that the *Rehaif* error affected his substantial rights. First, Defendant has made no attempt to show that he would not have pled guilty but for the *Rehaif* error. *See id.* Although arguing that allowing his guilty plea to stand would be unfair, he has not asserted that he would have gone to trial had he understood the knowledge-of-status element. *See United States v. Hicks*, 958 F.3d 399, 402 (5th Cir. 2020) (inferring that the defendant had not suffered prejudice given his failure to even assert "that he would have gone to trial if he had been informed of the knowledge

16

of felon status requirement"); *see also United States v. Coleman*, 961 F.3d 1024, 1030 (8th Cir. 2020) (concluding that the defendant had not shown a reasonable probability that he would have gone to trial but for the *Rehaif* error where, among other things, he did "not argue [on appeal] that he would not have pleaded guilty had he known of *Rehaif*" and did "not assert that he in fact" was "unaware of his felon status").

Defendant's failure to attempt an explanation as to why awareness of the knowledge-of-status element would have caused him to reconsider his choice to plead guilty is unsurprising. The record here demonstrates that the Government could have readily proven beyond a reasonable doubt that Defendant had the relevant knowledge. *See United States v. Bates*, 960 F.3d 1278, 1296 (11th Cir. 2020) (finding no prejudice because, "[h]ad the government been required to prove that [the defendant] knew he was a felon at the time he possessed a firearm, there is overwhelming evidence to show that it would have easily done so"); *United States v. McLellan*, 958 F.3d 1110, 1118, 1120 (11th Cir. 2020) (finding no prejudice where "the record reveal[ed] no basis for concluding that the government would have been unable to prove that [the defendant] knew he was a felon when he possessed the gun"); *United States v. Burghardt*, 939 F.3d 397, 404 (1st Cir. 2019) ("Our own review of the record nevertheless reveals no reason to think that the government would have had any difficulty at all in offering overwhelming proof

17

that [the defendant] knew that he had previously been convicted of offenses punishable by more than a year in prison.").

Indeed, given Defendant's criminal history, no reasonable juror could have found otherwise. *See United States v. Hobbs*, 953 F.3d 853, 858 (6th Cir. 2020) ("No reasonable juror could have believed that [the defendant] did not know he had been convicted of a crime punishable by imprisonment for a term exceeding one year" when the defendant "had *served* six years in prison." (alterations accepted) (emphasis in original) (quotation marks omitted)); *see also United States v. Williams*, 946 F.3d 968, 973 (7th Cir. 2020) (noting that the defendant "cannot plausibly argue that he did not know his conviction had a maximum punishment exceeding a year" when he had served more than a year in prison).

Of the twelve criminal convictions identified in Defendant's PSR, at least four were for felonies.[3]  Defendant did not dispute the PSR's description of his lengthy criminal history, which showed that he had received a five-year prison sentence for sale of cocaine and had served more than a year in prison for that conviction after several parole violations.  *See Greer*, 141 S. Ct. at 2098 (rejecting the argument that a court could not consider information in the PSR in assessing

---

[3]  Three of those were the convictions that formed the basis for the ACCA enhancement discussed *infra*:  possession of marijuana with intent to distribute, burglary, and sale of cocaine. A fourth felony conviction was for possession of a firearm by a convicted felon, in violation of O.C.G.A. § 16-11-131(b).

prejudice on plain-error review). Notably, Defendant also had a prior conviction for being a felon in possession of a firearm, based on his guilty plea to the same, which fact indisputably shows that Defendant knew he was a felon. And knowledge of that status is all that *Rehaif* called for. But more than that—and more even than *Rehaif* required—this conviction demonstrated that Defendant also knew that possession of a firearm was illegal, given his felon status.

In somewhat similar scenarios, the Eighth and Fifth Circuit have likewise held that a defendant fails to show a reasonable probability that he would have gone to trial had he known about the *Rehaif* requirement. In *United States v. Caudle*, the defendant's PSR showed that he (1) "had twelve adult criminal convictions spanning more than thirty years," (2) had received a sentence of one year in prison plus probation for grand theft but later sustained a three-year term of imprisonment when his probation was revoked, and (3) had a separate conviction for being a felon in possession of a firearm. *United States v. Caudle*, 968 F.3d 916, 922 (8th Cir. 2020). Based on the PSR's description of the defendant's criminal history, to which the defendant did not object, the Eighth Circuit held that he had not shown a reasonable probability that he would have gone to trial but for the *Rehaif* error. *Id.* In *United States Hicks*, the PSR for the defendant showed that he had "received a six-year sentence" for a prior conviction, had "served more than two years' imprisonment on two separate occasions," and had been "arrested and

19

charged with being a felon in possession of a firearm in state court just two months before the incident that led to the [present federal] felon in possession charge." *United States Hicks*, 958 F.3d 399, 401–02 (5th Cir. 2020). "Given that the facts detailed in the PSR provide[d] ample support for the inference that [the defendant] knew of his felon status when he possessed the firearms," the Fifth Circuit "conclude[d] that [he] ha[d] failed to show that the *Rehaif* error affected his substantial rights." *Id.* at 402.

The same conclusion follows here. Given Defendant's undisputed criminal history, "it is inconceivable that [he] did not know that he was a felon when he possessed the gun." *McLellan*, 958 F.3d at 1119–20; *Burghardt*, 939 F.3d at 404 ("[T]he receipt of [sentences exceeding one year] would certainly have made clear to [the defendant] the fact that his offenses were punishable by more than a year in prison."); *cf. United States v. Innocent*, 977 F.3d 1077, 1082–83 (11th Cir. 2020) (holding that, although the defendant had "never served more than a year in prison for any of his convictions," he could not show that a *Rehaif* defect in his indictment caused prejudice because he had four prior felonies and "someone who has been convicted of felonies repeatedly is especially likely to know he is a felon").

Moreover, a defendant with multiple felony convictions will presumably be quite hesitant to air that dirty laundry in front of a jury. Yet, exposure of that

record—with the unflattering inferences a jury might draw from such a criminal history—will be the likely result if the defendant disputes knowledge of his own felon status. *See Bates*, 960 F.3d at 1296 ("[The defendant] cannot credibly contend that he would have changed his decision to plead guilty and, instead, have opted for the government to prove that he knew he was a felon by offering evidence related to all seven of his prior convictions."); *Williams*, 946 F.3d at 974 ("By putting his knowledge at issue, though, [the defendant] would be allowing the government to introduce evidence about the nature of his conviction that would otherwise be too prejudicial."). For all these reasons, the record does not show a reasonable probability that Defendant would have gone to trial but for the *Rehaif* error. Defendant's claim therefore fails as to the third plain-error factor.

If a defendant meets each of the first three prerequisites demonstrating plain error, we must next address the fourth element, which requires the reviewing court to determine whether to exercise its discretion to notice the forfeited error: something that we do "only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Hernandez,* 906 F.3d 1367, 1370 (11th Cir. 2018). Because Defendant failed to show that his substantial rights were affected, we need not reach this fourth prong of the plain-error test. We therefore affirm Defendant's conviction for being a felon in possession of a firearm.

21

## II.    Whether Defendant's Prior Georgia Burglary Conviction Qualifies as a Predicate Crime for ACCA Purposes

### A.    Legal Background and Analytical Framework

Defendant was convicted of being a felon in possession of a firearm, which carries a statutory maximum sentence of ten years unless the defendant is subject to a sentencing enhancement under the ACCA.  *See* 18 U.S.C. §§ 922(g), 924(a)(2).  The ACCA applies to enhance the sentence of a defendant convicted under § 922(g) who has three or more prior convictions for a serious drug offense or a violent felony as defined by the ACCA.  A defendant who qualifies for enhancement under the ACCA must be sentenced to at least fifteen years of imprisonment.  *Id.* § 924(e)(1).  In addition, application of the ACCA results in a higher recommended guidelines range.  *See* U.S.S.G. § 4B1.4.  In this case, the ACCA enhancement resulted in a recommended guidelines range of 235 to 298 months.  The district court imposed a 235-month sentence.

Defendant claims that the district court erred when it enhanced his sentence pursuant to the ACCA.  He does not dispute that he has two prior serious drug offense convictions, but he argues that he lacks the third qualifying conviction necessary to trigger the ACCA because his 2003 Georgia burglary does not qualify as a violent felony under that statute.  Whether Defendant's 2003 Georgia burglary conviction satisfies the ACCA's definition of a violent felony is a question of law this Court reviews *de novo*.  *See United States v. DeShazior*, 882 F.3d 1352, 1354

22

(11th Cir. 2018); *see also United States v. Gundy*, 842 F.3d 1156, 1160 (11th Cir. 2016) (reviewing *de novo* whether a defendant's prior Georgia burglary convictions qualified as violent felonies under the ACCA).

The ACCA defines a violent felony as "any crime punishable by imprisonment for a term exceeding one year" that:

> (i)     has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)    is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

18 U.S.C. § 924(e)(2)(B).  The district court characterized Defendant's Georgia burglary conviction as an ACCA-predicate offense based on the first clause of section (ii) of the above definition, which identifies burglary, arson, extortion and an offense involving the use of explosives as predicate crimes.  We refer to this part of the statute as the "enumerated crimes clause."

When a prior crime is potentially eligible as a predicate offense under section (i) of the statute, which is referred to as the "elements clause," a sentencing court must determine whether the elements of this prior offense prohibit the specified uses of physical force against another person set out in the ACCA.  The enumerated crimes clause of the ACCA, however, is not defined based on any elements of the specified offenses.  Instead, section (ii) uses familiar labels, such as burglary, to identify an offense that qualifies under the clause.  The Supreme

23

Court, however, has held that to qualify as a predicate crime, a state's label is insufficient: "We think that 'burglary' in § 924(e) must have some uniform definition independent of the labels employed by the various States' criminal codes." *Taylor v. United States*, 495 U.S. 575, 592 (1990). Accordingly, a prior state conviction for a purportedly enumerated crime can qualify as a violent felony only if the conviction is for the "generic" version of one of the crimes set out in the clause. *Id*. at 598. A defendant's conviction under a state statute satisfies the ACCA's enumerated crimes clause "if, but only if, its elements are the same as, or narrower than, those of the generic offense." *Mathis v. United States*, 136 S. Ct. 2243, 2247 (2016).

To determine whether a conviction is for the generic version of an enumerated ACCA crime, we apply a categorical approach. *See id.* at 600. That is, we look at how the state statute of conviction defines the crime rather than looking at the particular facts underlying a defendant's conviction. *See Welch v. United States*, 136 S. Ct. 1257, 1262 (2016) ("Under the categorical approach, a court assesses whether a crime qualifies as a violent felony in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." (quotation marks omitted)).

In certain cases, we may use a modified categorical approach to determine whether a defendant's conviction qualifies as an ACCA enumerated crime. *See*

24

*Mathis*, 136 S. Ct. at 2249 (describing the modified categorical approach and clarifying when it applies). The modified categorical approach only applies when a criminal statute is divisible, meaning that it "list[s] elements in the alternative, and thereby define[s] multiple crimes." *Id.* When that is the case, the modified categorical approach allows us to examine a "limited class of documents"—known as *Shepard* documents and including such items as the indictment, jury instructions, and plea agreement—"to determine what crime, with what elements, a defendant was convicted of" so we can then assess whether the conviction is for a generic ACCA enumerated crime. *Id.*

**B.      Defendant's 2003 Georgia Burglary Conviction, Taken by Itself, Satisfies the Requirements of the Enumerated Crimes Clause**

In 2003, Defendant pled guilty to and was convicted of being a "party to" burglary in violation of O.C.G.A. § 16-7-1. At the time of Defendant's conviction, Georgia's burglary statute provided that:

> A person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another or enters or remains within any other building, railroad car, aircraft, or any room or any part thereof. . . .

O.C.G.A. § 16-7-1(a) (2011).[4]

---

[4]  Georgia's burglary statute was amended in 2012, but prior to the 2012 amendment the statute had not been amended since 1980. *See* 2012 Ga. Laws 899. Defendant was thus convicted under the 2011 version of O.C.G.A. § 16-7-1 in 2003.

25

Generic burglary has been defined as an unlawful or unprivileged entry into, or remaining in, a building or structure with the intent to commit a crime. *See Taylor*, 495 U.S. at 598–99. In *United States v. Gundy*, this Court determined that although the Georgia burglary statute cited above is broader than generic burglary, the statute is divisible with some elements rendering burglary generic. *Gundy*, 842 F.3d at 1165, 1167–68. As such, the Court explained in *Gundy*, the modified categorical approach applies to determine whether a defendant's conviction under the statute satisfies the ACCA's enumerated crimes clause. *See id.* at 1168. Because the *Shepard* documents showed that Gundy had been convicted of burglarizing dwellings or businesses, the Court held that Gundy's convictions were for generic burglaries that qualified as ACCA enumerated crimes. *See id.* at 1169.

The *Shepard* documents in this case likewise show that Defendant's 2003 Georgia burglary conviction was for generic burglary as defined by *Gundy*. The underlying indictment charges Defendant and his co-defendant with committing burglary by unlawfully entering a dwelling house with the intent to commit a theft therein. When Defendant pled guilty to that charge, he was convicted of committing an offense that includes the three essential elements of generic burglary set forth in *Gundy*: (1) unlawful entry, (2) into a dwelling house or building, (3) with the intent to commit a crime. Thus, Defendant's Georgia

26

burglary conviction qualifies as an ACCA enumerated crime under the *Gundy* standard.

### C.   Impact of Georgia's Party-to-a-Crime Statute

1.   Applicability of the ACCA when one has been convicted as an accomplice to a predicate crime

Defendant agrees that if we were looking at only his burglary conviction, it would qualify as a violent felony under the enumerated crimes clause. Defendant nevertheless argues that his 2003 Georgia burglary conviction loses its status as a violent felony because Georgia has a "party to a crime" statute, O.C.G.A. § 16-2-20, and he was convicted under that statute as a party to the crime of burglary. In essence, Georgia's party-to-a-crime statute is a catch-all statute that indicates a person can be convicted as a principal to a crime whether he directly committed the crime, aided and abetted its commission, or caused it to be committed. The statute provides as follows:

(a)   Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.

(b)   A person is concerned in the commission of a crime only if he:

(1)   Directly commits the crime;

(2)   Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;

(3)    Intentionally aids or abets in the commission of the crime; or

(4)    Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

*Id.*

In short, Georgia codifies both criminal and accessory liability in one statutory provision and it makes clear that an accomplice[5] will be held just as liable for a criminal offense as will the individual who directly committed the crime. Even assuming the Georgia party-to-a-crime statute could be considered to be divisible, Defendant's conviction did not reference whether he was convicted as a principal—that is, a person who directly committed the crime—under O.C.G.A. § 16-2-20(b)(1) or as an aider and abettor[6] of the crime under O.C.G.A. § 16-2-20(b)(2)–(4). Nor are there any *Shepard* documents to indicate under which status Defendant was convicted.[7] Accordingly, we must assume that he was not convicted as a principal to the charged burglary, but instead as an aider and abettor.

---

[5] Throughout this discussion, we use the terms "accomplice," "aider and abettor," and "party to a crime" interchangeably.

[6] We use the term aiding and abetting in describing the Georgia statute to encompass all forms of accomplice liability set out therein.

[7] The PSR indicates that both Defendant and co-defendant Hill directly committed the burglary by jointly entering a home without permission and stealing several items. But facts in the PSR that the defendant has objected to are not *Shepard* documents. *See United States v. Rosales-Bruno*, 676 F.3d 1017, 1023 (11th Cir. 2012) (noting that the Government must prove the facts in the PSR to which the defendant objects). Defendant objected to the paragraphs of the PSR describing the burglary.

28

All this being so, Defendant argues that we must factor the Georgia party-to-a-crime statute into our analysis of whether his conviction for Georgia burglary qualifies as a generic burglary conviction under the enumerated crimes clause of the ACCA.  We agree, but first things first.  That Georgia construes an accomplice's liability for the commission of a crime equal to that of a principal does not, by itself, call into question the eligibility of a Georgia offense as a qualifying ACCA conviction.  In fact, both the Supreme Court and our Court have rejected such an argument.

In *Gonzalez v. Duenas-Alvarez*, 549 U.S. 183 (2007), Duenas-Alvarez was a permanent resident alien whose removal from the United States had been ordered pursuant to the Immigration and Nationality Act ("INA") based on his California conviction for car theft, with the INA providing that a prior theft conviction is a ground for deportation.  Duenas-Alvarez challenged this decision, arguing that because the pertinent statute treated an accessory to such a theft just as it treated the person who actually drove the car away, California's car theft statute did not constitute a generic theft offense under *Taylor*.  The Supreme Court agreed that it must determine whether car theft under California law constituted generic theft under the INA, but it disagreed that the fact that California law treats an accomplice to car theft the same as it treats the principal necessarily renders its theft statute non-generic.  First, the Court noted, every jurisdiction—all fifty states

29

and the federal government—"has 'expressly abrogated the distinction' among principals and aiders and abettors," with the latter term referring to those who were present at the scene of the crime as well as those whose assistance occurred before the crime. *Id*. at 189. In short, these jurisdictions—state and federal—"treat similarly" principals and aiders and abettors. *Id*. at 190. That being so, "[s]ince criminal law now uniformly treats [principals and aiders and abettors alike], 'the generic sense in which' the term 'theft' is now used in the criminal codes of most States . . . covers such 'aiders and abettors' as well as principles. And the criminal activities of these aiders and abettors of a generic theft must themselves fall within the scope of the term 'theft' in the federal statute." *Id*. (internal citation omitted).

Our court has adhered to the principle set out in *Duenas-Alvarez*. In *In re Colon,* 826 F.3d 1301, 1305 (11th Cir. 2016), the defendant challenged the district court's determination that his federal conviction for aiding and abetting a Hobbs Act robbery counted as a crime of violence under the elements clause for purposes of permitting a separate conviction for his aiding and abetting the carrying, use, or brandishing of a firearm during a crime of violence under § 924(c). We rejected his argument that a federal crime ceases to function as a crime of violence (or violent felony)[8] simply because the defendant was convicted of aiding and abetting

---

[8] Section 924(e) uses the term "violent felony," whereas § 924(c) uses the term "crime of violence." For our purposes here, there is no difference in the terms.

that crime, as opposed to being convicted solely as a principal. We noted that aiding and abetting is "not a separate federal crime, but rather an alternative charge that permits one to be found guilty as a principal." *Id.* at 1305 (quotation marks omitted).

Likewise, in *Boston v. United States*, 939 F.3d 1266 (11th Cir. 2019), the defendant challenged his ACCA sentencing enhancement, which was based on multiple Florida convictions for principal to a robbery with a firearm. Under Florida law, a "principal" describes the person who committed the crime or anyone who has aided and abetted the commission of the crime. *Id*. at 1271–72. Because a person convicted as a principal may have functioned merely as an aider and abettor, the defendant argued that his Florida robbery conviction did not meet the ACCA's elements clause. Citing *Colon*, we held that "one who commits the Florida crime of principal to armed robbery necessarily commits the Florida crime of armed robbery." *Id*. at 1271.

In short, an ostensible predicate crime is not deprived of that status merely because the conviction may have been based on conduct that aided and abetted the crime. Of course, besides making sense simply as a matter of legal analysis, this conclusion is also bolstered by a very practical observation. Were it otherwise, Congress would have enacted a sentencing enhancement statute for which no prior criminal conviction could ever serve as a predicate crime. As the Fourth Circuit

31

has noted in rejecting a defendant's argument that any criminal statute conferring principal liability on an aider and abettor is a statute that cannot be deemed to create a predicate crime: "Such a holding would mean that *no* federal offense could be treated as a predicate offense for purposes of ACCA, the Sentencing Guidelines, the Immigration and Nationality Act, or any other statute under which courts use the categorical approach." *United States v. Cammorto*, 859 F.3d 311, 316 (4th Cir. 2017) (emphasis in original). Moreover, the court noted, there would likewise be no state criminal statute that could qualify as a predicate crime because "the criminal systems of *all States* have abolished the distinction between principal and aider-or-abettor liability." *Id*. at 316 (citing to *Duenos-Alvarez*, 549 U.S. at 189–90) (emphasis in original).

In other words, in enacting the ACCA, Congress would have created an empty set—a statutory penalty that could never be triggered—were one to exclude as a predicate crime the aiding and abetting of criminal conduct that would otherwise constitute a violent felony or serious drug offense under the ACCA. As the Supreme Court held in *Duenas-Alvarez*, such a conclusion is untenable.

2.    Determination of the breadth of a particular aiding and abetting offense

That a conviction's status as an ACCA-predicate crime is not necessarily altered merely because the defendant may have been convicted as an accomplice instead of as a principal does not mean that the elements of the relevant

32

jurisdiction's aiding-and-abetting statute escape scrutiny. As with the enumerated crimes clause, in which the elements of qualifying offenses were not spelled out, the ACCA does not spell out what elements of aiding and abetting are required to create a paradigm aiding-and-abetting standard. So, the definition of such a "generic" standard must be determined, with that standard being applied to the aiding-and-abetting statute at issue. Then, so long as the latter is not broader than the former, it would qualify under the ACCA.

And this is the approach that the Supreme Court took in *Duenas-Alvarez*. Duenas-Alvarez had argued that California's aiding-and-abetting standard was broader than the standard applied in most states because California held an aider and abettor criminally responsible not only for the crime he intended, but also for any crime that naturally and probably resulted from his intended crime. *Duenas-Alvarez*, 549 U.S. at 190. The Supreme Court rejected this as a reason to conclude that California law had created a non-generic theft crime via this purportedly non-generic aiding-and-abetting standard. Noting that relatively few states had expressly rejected the "natural and probable consequences" doctrine that the defendant decried, the Court noted that both the federal government, as well as many states, apply some version of that doctrine and permit the jury to infer intent in circumstances similar to those in which California has applied the doctrine. *Id.* at 191.

33

Beyond accepting the natural-and-probable-consequences doctrine as part of generic aiding-and-abetting principles, the Court emphasized that to prevail in its argument that a state's aiding-and-abetting law is non-generic, a defendant "must show something *special* about [the State's] version of the doctrine." *Id*. (emphasis in original). Then, in a statement often quoted, the Court made clear that success in such an endeavor entails more than linguistic gymnastics. Specifically, "to find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal imagination to a state statute's language." *Id.* at 822. Instead, "[i]t requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." *Id.*

In deciding whether a Washington conviction constituted a predicate drug-trafficking crime, our Court has recently been called on to decide whether that state's accomplice-liability statute is overbroad, thereby disqualifying the substantive drug conviction as a predicate crime. In *Bourtzakis v. United States Attorney General*, 940 F.3d 616 (11th Cir. 2019), the plaintiff had applied for naturalization pursuant to the INA, but his application was denied because of a prior Washington drug conviction for delivery of cocaine. *See id*. at 618. Under the INA, one cannot be naturalized if he has been convicted of an aggravated felony during the relevant time period; and a drug-trafficking crime, as defined

34

under federal statutory law, constitutes an aggravated felony. *Id*. at 619. The elements of the Washington drug crime for which Bourtzakis was convicted mimicked the elements set out in federal law for a drug-trafficking offense. *Id.* at 621. Accordingly, the Department of Homeland Security determined that Bourtzakis had been convicted of an aggravated felony, and it denied his application for naturalization. *Id*. at 619.

On appeal to this Court, there was no disagreement that, taken by itself, Bourtzakis's Washington drug conviction categorically qualified as a drug-trafficking crime. Nonetheless, Bourtzakis contended that the substantive statute of conviction was not the only statute that had to satisfy categorical muster. In addition, he noted, Washington has a separate, stand-alone accomplice-liability statute and, because this statute is incorporated into every substantive Washington criminal charge, Bourtzakis argued that Washington's accomplice-liability law also has to be considered. He further contended that because this state accomplice statute provides for broader criminal liability than does federal accomplice law, his Washington drug conviction did not categorically qualify as a drug-trafficking crime under the INA. *See id.* at 620.

Even though Bourtzakis had apparently been convicted only as a principal, not as an accomplice to the charged cocaine delivery, our Court agreed that Washington law permits a person charged as a principal to be convicted based on

35

evidence proving that he was an aider and abettor, meaning that Bourtzakis's drug conviction could have conceivably been based on evidence supporting accomplice liability. *Id*. at 621–22. This meant that Washington's accessory-liability statute had to be factored into the categorical analysis and its elements could not be "significantly broader" than those elements of its federal aiding-and-abetting counterpart, 18 U.S.C. § 2, as that statute has been interpreted. *Id.* at 622.

Yet, although we agreed that Washington accomplice law had to be examined, given its apparent incorporation into all of the state's criminal statutes, we disagreed that this examination prompted a conclusion that Bourtzakis's Washington drug conviction flunked the categorical test for a drug-trafficking conviction. Specifically, citing *Duenas-Alvarez*, we determined that Bourtzakis had failed to "establish a 'realistic probability' that accomplice liability under the Washington statute 'extends significantly beyond' liability under the federal Act." *Id*. That is, "the Washington statute is no broader than the federal Act [because] it proscribes conduct that qualifies as aiding and abetting an offense under the federal Act." *Id.*

As to what must be proved to establish aiding and abetting under 18 U.S.C. § 2, we looked to the Supreme Court's most recent pronouncement on that subject, quoting its statement that "the prosecution must show that the defendant associated herself with a criminal venture, participated in it as something she wished to bring

36

about, and sought by her actions to make it succeed." *Id*. (citation omitted).  As to a more precise *mens rea* or intent requirement, we noted that, under *Rosemond*, the latter is "satisfied when a person actively participates in a criminal venture with full *knowledge* of the circumstances constituting the charged offense." *Id*. at 623 (emphasis in original) (quoting *Rosemond v. United States*, 572 U.S. 65, 77 (2014)).

Bourtzakis had argued that Washington law more broadly defines aiding-and-abetting liability because it requires only that an accomplice know his actions will facilitate the commission of the particular crime, whereas federal law requires an intent to facilitate the crime's commission. *Id*. at 622.  We rejected this argument, concluding that, although the Washington and federal standards are worded slightly differently, "*Rosemond* makes clear, the 'intent' required for federal accomplice liability is satisfied by proof that the accomplice actively participated in the crime and knew the nature of the crime—the same proof of *mens rea* that Washington requires for accomplice liability." *Id*. at 624.  We likewise rejected Bourtzakis's argument that Washington caselaw establishes that mere presence at the scene of a crime is sufficient to confer accessory liability. *Id*. In summary, we concluded that Bourtzakis had failed to identify "any Washington caselaw that establishes a 'realistic probability' that accomplice liability under the

37

Washington drug statute 'extends significantly beyond' accomplice liability under the federal Act."  *Id*. at 623.

> 3.    Whether Georgia's party-to-a-crime statute extends so significantly beyond generic accomplice liability that it thereby renders non-generic a Georgia burglary conviction

Distilling the guidance provided in *Duenas-Alvarez* and *Bourtzakis*, Defendant must establish a "realistic probability that accomplice liability" under Georgia's party-to-a-crime statute "extends significantly beyond" generic accomplice law in order to prevail on his ACCA argument.  *See Bourtzakis*, 940 F.3d at 622 (alteration accepted) (quotation marks omitted).  Defendant can do this by showing that the plain language of the Georgia statute sets out an accomplice-liability standard that significantly diverges from generic accomplice law.  *See id.* at 624.  Assuming the statutory language does not on its face establish a standard that is materially different from generic accomplice law, Defendant must "point to his own case or other cases in which the state courts in fact did apply" the Georgia party-to-a-crime statute in the broad "manner for which he argues."  *See id.* at 620 (quotation marks omitted).

Defendant and the Government agree that the generic standard for criminal liability based on the aiding and abetting of a crime can be found in the standard

38

articulated by the Supreme Court in *Rosemond*.[9]  There, the Supreme Court offered various iterations describing that standard.  Specifically, the aider and abettor must "provide knowing aid" to the person committing the crime, "with the intent to facilitate the crime."  *Rosemond*, 572 U.S. at 71.  "As at common law, a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."  *Id*.  The Court made clear that a defendant need not participate in every element of the crime to satisfy the affirmative-act requirement and that participation in the form of "words, acts, encouragement, support, or presence" will suffice.  *See id.* at 73.  The "intent requirement [is] satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances."  *Id.* at 77.  "[A] person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission."  *Id.*; *see also* 2 W. LaFave, Substantive Criminal Law § 13.2, p. 337 (2003) (hereinafter LaFave) ("It may generally be said that one is liable as an accomplice to the crime of another if he (a) gave assistance or encouragement or failed to perform a legal duty to prevent it (b) with the intent thereby to promote or facilitate commission of the crime.").

---

[9] *Rosemond* indicated that the federal aiding and abetting statute, 18 U.S.C. § 2, is derived from common law. *Rosemond*, 572 U.S. at 70.

In short, an aider and abettor must take an affirmative act and must do so with the intent to facilitate the crime. Defendant argues that Georgia law does not require an affirmative act or intent to facilitate the crime. We address each argument in turn.

> a. Whether Georgia law has eliminated the requirement that an accomplice to a crime take an affirmative action

Defendant argues that Georgia law does not require an affirmative act in order to convict an accomplice of aiding and abetting commission of the crime. Yet, the plain language of Georgia's party-to-a-crime statute clearly requires some affirmative action in furtherance of the underlying crime, as it lists the specific acts that will suffice. Those acts include causing another person to commit the crime, aiding and abetting in the commission of the crime, and advising, encouraging, hiring, counseling, or procuring another person to commit the crime.[10] *See* O.C.G.A. § 16-2-20(b)(2)–(4).

---

[10] Defendant makes a passing argument that Georgia's party-to-a-crime statute does not always require an affirmative act because advising, encouraging, and counseling typically involve words rather than affirmative action. Yet, Defendant cites no authority in support of his argument that words do not qualify as affirmative action for purposes of generic accomplice liability, nor does he otherwise suggest a meaningful distinction between words and action in this context. Certainly, this distinction does not apply to federal accomplice liability. Specifically, in describing the type of conduct that constitutes an affirmative act necessary to sustain an aiding-and-abetting conviction under federal law, the Court in *Rosemond* explained that 18 U.S.C. § 2 "comprehends all assistance rendered by words, acts, encouragement, support, or presence." *Rosemond*, 572 U.S. at 73 (quotation marks omitted). State law likewise generally affirms that words—in the form of encouragement, advice, or support—can constitute the affirmative action necessary to subject a defendant to accomplice liability. *See* 2 LaFave § 13.2(a) (collecting state laws that impose accomplice liability when the defendant provides verbal assistance to a criminal

In addition, Georgia pattern jury instructions make clear that mere presence at the scene of a crime will not suffice to convict a defendant. The "mere presence" charge provides:

> A jury is not authorized to find a person who was merely present at the scene of the commission of a crime at the time of its perpetration guilty of consent in and concurrence in the commission of the crime, unless the evidence shows, beyond a reasonable doubt, that such person <u>committed</u> the alleged crime, <u>helped</u> in the actual perpetration of the crime, <u>or participated</u> in the criminal endeavor.

Georgia Suggested Pattern Jury Instructions – Criminal, *1.43.30 Mere Presence; Guilt by* (4th Ed. 2021) (emphasis added). A second instruction offers the same caveats regarding a person who was merely associated with other persons involved in the crime:

> A jury is not authorized to find a person who was merely associated with other persons involved in the commission of a crime guilty of consent in or concurrence in the commission of the crime, unless the evidence shows, beyond a reasonable doubt, that such person <u>helped in the actual perpetration</u> of the crime <u>or participated</u> in the criminal endeavor.

Georgia Suggested Pattern Jury Instructions – Criminal, *1.43.31 Mere Association; Guilt by* (4th Ed. 2021) (emphasis added).

Because the plain language of Georgia's party-to-a-crime statute corresponds with the narrowest plausible definition of an affirmative act under a

---

endeavor "without actually rendering physical aid"); Model Penal Code § 2.06(3) (defining an accomplice to include a person who "solicits" another person to commit a crime, as well as a person who "aids or agrees or attempts to aid" another person in "planning" a crime).

generic accomplice standard, Defendant can prevail on his ACCA argument only if he shows that Georgia caselaw gives rise to a "realistic probability" that the statute will be applied in the overbroad way he suggests. *See Bourtzakis*, 940 F.3d at 620. That is, in the absence of significantly divergent state statutory language, the proponent of an overbreadth argument must "point to his own case or other cases in which the state courts in fact did apply" the state accomplice-liability statute "in the broad manner for which he argues." *See Bourtzakis*, 940 F.3d at 620 (citing *Duenas-Alvarez*, 549 U.S. at 193) (quotation marks omitted).

Attempting to shoulder that burden, Defendant argues that, in practice, Georgia's party-to-a-crime statute has sometimes been applied in a way not requiring an affirmative act by the defendant to facilitate the crime. Defendant offers two Georgia appellate cases that he says authorized the giving of an instruction that dispensed with an affirmative-act requirement and thereby rendered Georgia's accomplice caselaw non-generic: *Potts v. State*, 331 Ga. App. 857 (2015) and *Carter v. State*, 224 Ga. App. 445 (1997). We are unpersuaded by his argument.

The defendant in *Potts* was one of eight men charged with aggravated assault, armed robbery, and other crimes related to a robbery and shooting outside the victim's residence. *See Potts*, 331 Ga. App. at 857. Despite evidence establishing the defendant's active participation in the crimes—including evidence

that he planned and orchestrated the robbery, carried and fired a gun during its commission, and disposed of the gun afterward—Potts argued he could not be convicted because he was "merely present" at the crime scene. *See id.* at 864. Defendant here complains that by instructing the jury that a defendant's "presence, companionship and conduct before and after the offense are circumstances f[rom] which [a defendant's] participation in the criminal intent may be inferred," the trial court in *Potts* eliminated the requirement that Potts commit an affirmative act, and the Georgia Court of Appeals endorsed that decision when it affirmed the conviction. *Id.* Defendant is wrong. This instruction did not diminish the requirement that the jury find participation—that is, an affirmative act—by the defendant in order to convict him as a party to the underlying crimes. Indeed, as the Georgia Court of Appeals noted, the trial court in *Potts* clearly articulated that requirement when it also instructed the jury that the defendant's mere presence at the crime scene was <u>insufficient</u> to sustain a conviction against him and that the jury must acquit the defendant if it did not find from the evidence that he "knowingly and intentionally participated in or helped in the commission" of the crimes charged. *See id.* at 862.

Likewise in *Carter*, the trial court instructed the jury that "mere presence at the scene" of a crime was insufficient to establish accomplice liability under Georgia's party-to-a-crime statute but that "presence, companionship, and conduct

43

before and after the offense are circumstances from which [a defendant's] participation in the criminal intent may be inferred." *See Carter*, 224 Ga. App. at 446–47. Again, this instruction does not create an exception to the affirmative-act requirement. It simply describes the evidence that the jury may consider in deciding (1) whether the defendant actively participated or assisted in the commission of the crime and (2) whether he did so with the necessary intent. As in *Potts*, there was ample evidence in *Carter* from which the jury could infer such active participation in the theft at issue, including evidence showing that (1) the defendant fled the scene of the theft with a group of men, one of whom had been seen grabbing the victim's purse and pulling her to the ground and (2) the defendant then drove the group of men away from the scene of the theft in a car that later was discovered to contain the victim's credit cards, social security card, and driver's license. *See id.* at 446.

Defendant also attempts to support his argument by reverse engineering two Georgia appellate cases in which the challenges to the convictions were based on insufficiency of the evidence: *Rinks v. State*, 313 Ga. App. 37 (2011) and *Shockley v. State*, 297 Ga. 661 (2015). Defendant argues that, by finding sufficient evidence to convict in those two cases, the Georgia Court of Appeals and Georgia Supreme Court implicitly indicated that one could be convicted as an aider and abettor without an affirmative act. Yet, neither *Rinks* nor *Shockley* raises a realistic

44

probability that a defendant can be convicted as a party to a crime under Georgia law without taking an affirmative act to facilitate the crime.

As Defendant acknowledges, the Georgia appellate court stated just the opposite in *Rinks* when the court emphasized that, under Georgia law, "[g]enerally, aiding and abetting the commission of a crime requires affirmative action," and "[m]ere presence at the scene of a crime, or even approval of the criminal act not amounting to encouragement, will not suffice to show participation in a crime . . . ." *Rinks*, 313 Ga. App. at 38. The court in *Rinks* explained further that a jury could infer that a defendant "intentionally encouraged the commission of [a] criminal act"—and thereby acted affirmatively in furtherance of the crime—from evidence of the defendant's "conduct prior to, during, and after" the crime was committed, including evidence that the defendant had prior knowledge of the crime, was present at the crime scene, and failed to disapprove or oppose commission of the crime. *See id.* at 38–39. But that explanation does not dispense with the requirement that a defendant affirmatively act in furtherance of a crime to be convicted as a party to the crime under O.C.G.A. § 16-2-20. It simply describes the evidence from which a jury can reasonably infer that a defendant engaged in one of the affirmative acts set out in the statute—such as aiding and abetting or encouraging the commission of a crime—and that he did so with the necessary common criminal intent. *See* O.C.G.A. § 16-2-20(b)(3), (4).

45

And there was substantial evidence that the defendant in *Rinks* took such affirmative action. *See Rinks*, 313 Ga. App. at 39 (describing evidence showing the defendant's active participation in the crime he was convicted of aiding and abetting). Rinks was convicted of entering an automobile with intent to commit a theft where the evidence showed that he drove his co-defendant to a Rite Aid parking lot and sat behind the wheel of his idling truck while his co-defendant, in plain view, smashed the window of a car that was parked nearby, grabbed a purse from the car, and then jumped into the passenger seat of the idling truck, which Rinks then drove to his apartment. When the police subsequently arrived at this apartment, Rinks lied to them about his knowledge of the theft and the whereabouts of his co-defendant, whom the police next discovered hiding in the closet of Rinks's apartment, with the stolen purse found in a trashcan. *See id.* The Georgia court held that a jury could infer from this evidence that "Rinks intentionally aided, abetted, or encouraged [his co-defendant's] direct commission" of the theft. *See id.* That is, the jury could infer that Rinks had taken one of the affirmative acts set out in Georgia's party-to-a-crime statute. It did not hold that Rinks could be convicted as a party to a crime under the statute without having engaged in such an affirmative act. In contrast, in *Crumpton v. State*, 240 Ga. App. 422 (1999), the Georgia Court of Appeals reversed the defendant's party-to-a-crime burglary conviction because the State's evidence did not show an affirmative

act. *Id*. at 423–24 (observing that the evidence showed merely that the defendant had cashed stolen checks after the burglary, knowing that they were stolen, and while such conduct might prove him to have been an accessory after the fact, it did not show that he had intentionally aided or abetted the commission of the crime or had intentionally advised, encouraged, counseled, or procured another person to commit the crime: elements that must be proved to convict one of being a party to a crime).

Likewise in *Shockley*, the Georgia Supreme Court affirmed the defendant's conviction as a party to murder where the evidence showed: (1) defendant Shockley and another individual got into a car with the victim driver shortly before the victim was shot at close range in the right temple; Shockley sat in the passenger seat of the a car and the other individual sat in back; (2) after the victim drove off with Shockley in tow, witnesses saw the car crash into a pole, after which the passenger in the backseat of the car immediately exited, pacing back and forth; (3) the person seated in the front passenger seat (Shockley) exited a few seconds later; (4) Shockley and this other individual stood behind the car for a few seconds, as if deciding what to do; (5) Shockley and the other individual then "ran off together and disappeared into a trail through the woods"; and (6) the victim was determined to have been shot at close range in the right temple, with his left pocket turned inside out. *See Shockley*, 297 Ga. at 662. Additional evidence showed that

47

Shockley then fled the jurisdiction. *See id.* at 663. The court held the defendant could be convicted as a party to the crime based on all the circumstances, including testimony establishing the defendant's location "in the car at the time of the shooting" as well as evidence showing that the defendant "fled the scene with [the other individual who was in the car at the time of the shooting], and that he later fled the jurisdiction." *Id.* at 664–65.

As in *Rinks*, the court in *Shockley* did not dispense with the affirmative-act requirement, but rather held there was evidence from which the jury could infer such an act, as well as the defendant's intent. *See id.* (explaining that Georgia courts have "often held that a jury is authorized to find a defendant guilty as a party to a crime from evidence of the defendant's presence, companionship, and conduct before and after a crime"). To be able to show that a state has effectively rescinded its affirmative act requirement for accomplice liability based on an appellate court's determination that the evidence in a particular case was sufficient to prove that act, a defendant should provide a case where the insufficiency of the evidence is fairly clear cut. As *Bourtzakis* stated, a defendant must show a "realistic probability" that accomplice liability for the challenged predicate crime "extends significantly beyond" the parameters of generic accomplice liability. *Bourtzakis*, 940 F.3d at 623–24. *Shockley* does not do the trick.

48

In short, Defendant has failed to show from Georgia caselaw's treatment of the affirmative act prong of the aiding-and-abetting doctrine a "realistic probability" that Georgia's party-to-a-crime statute extends liability "significantly beyond" generic accomplice law. *See Bourtzakis*, 940 F.3d at 622.

          b.      Whether Georgia law has eliminated the requirement that an accomplice to a burglary act with the intent to facilitate that crime

                i.      Georgia law requires that a party to a crime act with the intent to facilitate the charged crime

Defendant and the Government agree that the Supreme Court's decision in *Rosemond* provides guidance as to the standard that we should follow in assessing generic accomplice liability. As set out above, a defendant must not simply participate in the crime in some way but must also act with the intent to facilitate that crime. *See Rosemond*, 572 U.S. at 76. We have clarified that the intent requirement is "satisfied when [the defendant] actively participates in a criminal venture with full *knowledge* of the circumstances constituting the charged offense." *Bourtzakis*, 940 F.3d at 623 (emphasis in original).

Looking first to the language of the Georgia party-to-a crime statute, it clearly makes intent an element. That is, an accomplice must either intentionally cause the crime, intentionally aid or abet in its commission, or intentionally advise,

49

encourage, hire, counsel or procure another to commit the crime.  *See* O.C.G.A

§ 16-2-20(b)(2)–(4), respectively (emphasis added).

The Georgia pattern instructions likewise make clear that intent is an

element of every crime.  The instruction on intent provides that:

> Intent is an essential element of any crime and must be proved by the
> State beyond a reasonable doubt.
>
> Intent may be shown in many ways, provided you, the jury, believe that
> it existed from the proven facts before you.  It may be inferred from the
> proven circumstances or by acts and conduct, or it may be, in your
> discretion, inferred when it is the natural and necessary consequence of
> the act.  Whether or not you draw such an inference is a matter solely
> within your discretion.
>
> Criminal intent does not mean an intention to violate the law or to
> violate a penal statute but means simply the intention to commit the act
> that is prohibited by a statute.

Georgia Suggested Pattern Jury Instructions – Criminal, *1.41.10 Intent* (4th Ed.

2021).  Further, the jury may find intent, or the absence of it, based on "words,

conduct, demeanor, motive, and other circumstances connected with the act for

which the accused is being prosecuted." *Id.* at *1.41.11 No Presumption of*

*Criminal Intent*.

The Georgia pattern instructions also emphasize the necessity of knowledge

on the defendant's part:

> Knowledge on the part of the defendant that the crime of _____
> was being committed and that the defendant knowingly and
> intentionally participated in or helped in the commission of such crime
> must be proved by the State beyond a reasonable doubt.

50

> If you find from the evidence in this case that <u>the defendant had no knowledge that a crime was being committed</u> or that <u>the defendant did not knowingly and intentionally commit, participate, or help in the commission</u> of (and was not a conspirator in) the alleged offense, then it would be your duty to <u>acquit the defendant</u>.
>
> On the other hand, should you find, beyond a reasonable doubt, that the defendant had knowledge that the crime of _____ was being committed and that the defendant knowingly and intentionally participated or helped in the commission of it, then you would be authorized to convict the defendant.

*Id.* at *1.43.10 Knowledge* (emphasis added).

It should come as no surprise then to find repeated throughout Georgia caselaw the requirement that the State must prove that the accused accomplice shared a common criminal intent with the perpetrator in order to convict the accused as a party to the crime. As the Georgia Supreme Court has stated: "Mere presence at the scene of the crime and mere approval of the criminal act are not sufficient evidence to establish that the defendant was a party to the crime. Proof that the defendant shares a common criminal intent with the actual perpetrators is necessary." *Eckman v. State*, 274 Ga. 63, 65 (2001) (citations omitted). And that statement is hardly an isolated remark in Georgia caselaw; rather, it is a theme. *See, e.g., Hood v. State*, 309 Ga. 493, 498 (2020) ("Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the principal perpetrator of the crime . . . ." (quotation marks omitted)); *Jones v. State*, 292 Ga. 656, 658 (2013) ("[M]ere presence or approval of a criminal act is not

51

sufficient to render one a party to the crime, and a conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the principal perpetrator of the crime . . . [which] may be inferred from that person's conduct before, during, and after the commission of the crime.").

Georgia courts have not merely recited the above standard when affirming a conviction. They have also relied on the breach of this standard to reverse convictions. In *Bullard v. State*, 263 Ga. 682 (1993), the Georgia Supreme Court reversed a conviction for murder where the evidence did not support an inference that the defendant had advance knowledge that the shooter would shoot the victim or that he was otherwise complicit in the shooter's plan to shoot the victim. *See id.* at 684. The court concluded that, although the evidence was sufficient to prove the defendant guilty of helping to conceal the death of the victim, it was insufficient to demonstrate the defendant's intent to join in with the shooter in the latter's crime. For that reason, the court held that the defendant could not be convicted as a party to the crime. *Id*. at 686.

In *Ratana v. State*, 297 Ga. App. 747 (2009), the Georgia Court of Appeals reversed the defendant's conviction as a party to the crime of aggravated assault, based on a shooting at a block party. The evidence indicated that the shooting was spontaneous and unplanned as co-defendant Hicks ("the shooter") got into an argument with the victim and, while chasing him around the neighborhood, shot

52

and killed him.  *Id*. at 748.  Defendant Ratana was charged as a party to the crime, based on the fact that the shooter had been sitting in Ratana's car prior to the altercation, and, after the shooting, the shooter left the party in a car driven by Ratana.  Reciting the oft-quoted Georgia requirement that "[a] common criminal intent must be proven to establish that one is a party to a crime," the Court of Appeals concluded that the evidence was insufficient to show that Ratana's conduct and state of mind met that standard.  *Id.* at 749.  The court noted that there was no evidence that Ratana drove the shooter to the party with any notion that the latter would shoot someone and while the evidence indicated that Ratana drove the shooter away from the scene with the knowledge that he had just shot someone, this evidence did not support Ratana's conviction as a party to the crime of murder or aggravated assault.  *Id*. at 750.

Likewise, in *James v. State*, 260 Ga. App. 350 (2003), the Georgia Court of Appeals reversed a burglary party-to-a-crime conviction where the evidence did not support an inference that the defendant knew of the burglars' plan in advance of the commission of the crime or otherwise shared in their criminal intent to commit those particular crimes, albeit the defendant had acted as an accessory after the commission of the crime.

ii.    The *Cash* decision

In short, given all the above, Defendant here has not shown a "realistic probability" that accomplice liability for his predicate crime of burglary "extends significantly beyond" the parameters of generic accomplice liability. That said, Defendant has cited a Georgia Supreme Court case whose language gives some support to an argument that Georgia may have more recently embraced a theory of accomplice liability for aggravated assault that potentially creates broader accomplice liability as to that particular crime than would generic accomplice liability. The case is *Cash v. State*, 297 Ga. 859 (2015). Because aggravated assault is a very different type of crime than is burglary for purposes of the present examination, *Cash* does not undermine the status of a Georgia burglary accomplice conviction as a predicate crime. But before explaining why that is so, we first discuss why *Cash* creates some questions about the generic status of Georgia's accomplice law when applied to an aggravated assault charge.

Cash was convicted as a party to an aggravated assault,[11] based on uncontested evidence that, at the behest of the shooter-murderer, he lured the victim to the site of his execution. The shooter, Jimmy Craig Wright, suspected his wife of having an affair with the intended victim, Jimmy Jackson. So, he connived

---

[11] That conviction triggered a conviction for felony murder, given the death that resulted from the aggravated assault. For our purposes, though, it is the Georgia Supreme Court's analysis of the aggravated assault conviction that matters.

54

with Cash for the latter to stage a car breakdown on the side of the road in a rural area and to call the victim, who was a mutual acquaintance of both men, to seek the victim's assistance. On the night before the ambush, Cash had taken the shooter to a residence where the latter retrieved a sawed-off shotgun from a vehicle parked there. As planned, on the morning of the murder Cash called the victim, falsely claimed his car had broken down, and asked the victim to come out and help him. The victim dutifully reported to the site specified by Cash, got out of his own car, and spoke to Cash. The shooter immediately emerged from some trees where he had been hiding, rushed the victim, and shot him in the head with the sawed-off shotgun. As it happened, the victim had brought two other people with him: Cash's cousin, Chris, and a woman. The woman had stayed in the car while the victim checked on Cash's car, but Chris had gotten out of the car. Once the shooter had shot the intended victim (Jackson), Chris ran to a field to try to get away, but fell down. At that point, Chris saw the shooter approach the car and shoot the woman seated inside. The shooter found Chris on the ground and, mistaking him for Cash, made remarks suggesting that he had initially thought the woman in the car whom he shot was his wife. That woman was not his wife. Chris talked the shooter out of killing him by promising to keep quiet about what had happened, but once free, he contacted law enforcement. *Id.* at 859–60.

A jury convicted Cash of being a party to the crime of aggravated assault. According to the Georgia Supreme Court's opinion, Cash did not dispute at trial that he expected there would be a fight between the shooter and the man the shooter thought was sleeping with his wife; that he had previously witnessed the shooter's violent behavior; that the night before the murder he had driven the shooter to a residence where the latter retrieved a sawed-off shotgun from a vehicle;[12] or that he had agreed to set up the ambush in order to assault the victim. *Id.* at 860.  Further, Cash drove the shooter home immediately after the murders and he never contacted law enforcement before his arrest.  *Id.*  In addition, the shooter explained to the person he mistakenly thought to be Cash that he shot the woman sitting in the car because he had expected his wife to be with the victim that day and assumed the woman he shot was she.  This explanation "indicate[d] that a second assault [upon the wife] had been planned," *id.*, and—by relating the explanation to Cash—that the latter was in on that plan as well.

---

[12]  Although Cash did not disagree that, on the night before the shooting he had taken the shooter to a residence where the latter had retrieved a shotgun, Cash apparently did not concede his awareness that the shooter had gotten the gun during that trip. *See id.* at 863 (noting Cash's argument that a jury charge on a lesser-included offense was warranted based on "evidence that at the time the assaults took place, he thought there would be only some sort of fight and he was unaware that Wright was in possession of a weapon").

On appeal, Cash did not contest the sufficiency of the evidence to convict him of aggravated assault,[13] which required the State to prove that the shooter had committed an assault with a deadly weapon and that Cash was a party to that crime in that he intentionally aided and abetted the shooter. And how could Cash dispute that there was adequate evidence to convict him of knowingly and intentionally helping the perpetrator to commit an assault with a dangerous weapon? Cash had clearly helped the shooter execute his cold-blooded plan, and a jury could readily conclude from all the circumstances that Cash had done so knowing in advance what the shooter planned to do.

Likewise, Cash did not argue that the instructions given by the trial court concerning the aggravated assault charge were in error. That is, he did not argue that the court had failed to instruct the jury that it had to find beyond a reasonable doubt that Cash had acted knowingly and with intent to aid the commission of the crime that was charged: aggravated assault.

What Cash did contest was the trial court's refusal to give a lesser-included involuntary manslaughter instruction. And it is the language used by the Georgia Supreme Court in rejecting Cash's argument that our Defendant has jumped on to

---

[13] He did argue that he should be given a free pass on the felony murder conviction based on the killing of the woman in the car because the shooter had mistakenly shot the wrong woman. The Georgia Supreme Court rejected this argument, concluding that the doctrine of "transferred intent" applied, meaning both the shooter and Cash, as a party to the crime, were liable for that crime as well. *Id.* at 860–61.

claim that this language created—at least in the aggravated assault case before the court—a definition of aiding-and-abetting liability that was broader than generic accomplice liability.

What the Supreme Court said was that Cash clearly shared a criminal intent to assault the victim and was therefore obviously responsible for the assault he admittedly knew would occur if he led the victim into this ambush. *Id*. at 864. The court further stated that, even assuming Cash did not know the shooter would be armed with a shotgun, he was still chargeable with the foreseeable acts undertaken by the shooter in the furtherance of their shared intent to assault the victim. *Id*. And whether or not Cash actually knew that Wright would be carrying a gun, it was "certainly [] foreseeable that an assault in the circumstances presented here—an early-morning ambush on the side of a road to which the victims were lured unwittingly—might involve the use of a deadly weapon and may result in serious injury or loss of life." *Id*. Accordingly, the court concluded that, because the use of a dangerous weapon by the shooter was foreseeable, Cash could be deemed a party to the crime of aggravated assault even if Cash "did not know that [the perpetrator would be] armed with a shotgun." *Id*. Therefore, no lesser-included offense instruction was necessary.

On an initial glance, there does seem to be some tension between the Georgia Supreme Court's reasoning and what the United States Supreme Court in

58

*Rosemond* pronounced was the requirement for aiding-and-abetting liability in an analogous federal statute: § 924(c). Section 924(c)(1)(A) creates an additional crime when a person who commits a specified predicate crime (a crime of violence or drug-trafficking crime) does so while using or carrying a firearm. In other words, § 924(c) is a dual-layered offense, creating a new crime when a defendant uses or carries a firearm in tandem with the predicate criminal act. And, the Court noted, when one is talking about aiding-and-abetting liability in connection with such a "compound" crime, the question arises as to what intent is required in order to render an aider and abettor liable for the perpetrator's act. *Rosemond*, 572 U.S. at 71. Or as Justice Kagan punned: "When does a person act to further this double-barreled crime? And when does he intend to facilitate its commission?" *Id*.

With that intro, *Rosemond* explored the circumstances under which an active participant in a marijuana sale transaction (who was thus clearly guilty of a drug-trafficking crime) can be held liable under § 924(c) when a cohort shoots the purchasers who tried to rob the drugs. *Id*. at 67. It was Rosemond's position that because he did not bring a gun to the drug deal, or help his cohort do so, he should not be held liable under § 924(c), although clearly he could be convicted for the drug crime. *Id*. at 72. Accordingly, Rosemond argued, the district court (and the affirming Tenth Circuit) had erred when it refused to instruct the jury that aiding and abetting the underlying drug transaction is insufficient by itself to warrant a

59

conviction for § 924(c) and that a defendant must also have taken some action to facilitate his cohort's use or possession of the gun. *Id.* at 69–70.

As our earlier discussion indicated, the Supreme Court reversed, setting out the principles of aiding and abetting applicable in such a scenario. Specifically, a person aids and abets a crime when he acts with the intent "to facilitate that offense's commission. An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged," that is, "to the full scope (predicate crime plus gun use) of § 924(c)." *Id.* at 76 (citation omitted). The Court noted that the "intent requirement [can be] satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Id*. at 77. Providing a more direct application of this principle in the § 924(c) context, the Court stated that "an active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun." *Id*. at 77. He may not have facilitated his confederate's possession of the gun. He might not even be happy that his cohort chose to bring a gun along. But so long as he knows in advance that a gun will be present, he can likewise be held legally responsible for any § 924(c) violation that results. *See id*.

Georgia's aggravated assault statute is somewhat analogous to § 924(c).

Like § 924(c), it is compound in nature, with a basic element—drug trafficking or

a crime of violence in § 924(c) and assault in the Georgia statute—and an

aggravating element—the use of a firearm in § 924(c) or a dangerous weapon in

Georgia aggravated assault.[14]  That is, a defendant who is guilty of aggravated

assault under Georgia law must commit not just the crime of assault but also, as

pertinent here, must do so with a deadly weapon.  *See* O.C.G.A. § 16-5-21(b)(2).

Thus, application of the rule for compound offenses set out in *Rosemond* to an

aggravated assault offense would presumably mean that an aider and abettor of

aggravated assault must not just aid and abet the assault but must also be aware

that the perpetrator of the crime intends to use a deadly weapon.  And if that is

true, then the Georgia Supreme Court's statement in *Cash*—that so long as the

defendant knew there would be an assault and had intentionally aided and abetted

his cohort in making that assault, the defendant could be deemed guilty of aiding

and abetting a resulting aggravated assault even if he did not know that his co-

defendant would be using a deadly weapon—initially seems to be a statement that

is at odds with the standard the United States Supreme Court articulated in

*Rosemond*.

---

[14]  Georgia's aggravated assault statute lists other qualifiers that will elevate simple assault to the more serious aggravated assault, but Cash's aggravated assault charge involved assault with a dangerous weapon.

61

But not so fast.  The Georgia Supreme Court in *Cash* did not create a strict liability rule that holds an accomplice to a simple assault liable anytime the perpetrator actually engages in an aggravated assault.  That is, it did not hold that anytime a defendant intentionally aids and abets a simple assault, he will, regardless of his mental state, automatically be deemed liable for aggravated assault should the perpetrator unexpectedly convert a simple assault into an aggravated one by using a deadly weapon.  Rather, even with the assumption that the perpetrator had not expressly stated to Cash that he would be taking or using a gun when he ambushed the victim, the Georgia Supreme Court deemed Cash liable for the resulting aggravated assault because, under all the circumstances, it was reasonably foreseeable to Cash that the perpetrator would likely use a dangerous weapon when he accosted his intended victim.  After all, if the perpetrator had merely wanted to give the victim a stern talking-to or a busted lip, he did not need the elaborate ruse that he and Cash concocted to ambush the victim.  And the perpetrator's explanation to Cash to the effect that he had shot the woman in the car, after mistaking her for his wife, likewise suggested that the perpetrator had earlier let Cash in on the seriousness of his intentions, further bolstering the reasonable foreseeability of the use of a weapon by the perpetrator.

As to the role of foreseeability in determining whether a particular jurisdiction's accomplice liability is co-extensive with the generic standard for

aiding and abetting, the United States Supreme Court has concluded that an accomplice standard that holds an aider and abettor criminally responsible not only for the crime he intended, but also for any crime that naturally and probably results from his intended crime, jibes with a generic aiding-and-abetting standard. *See Duenas-Alvarez*, 549 U.S. at 190. As we explained earlier in this opinion, the Supreme Court declined to deem a California theft conviction non-generic simply because that state's aiding-and-abetting standard included the "natural and probable consequences" doctrine. The Court noted that both the federal government, as well as many states, apply some version of that doctrine and permit the jury to infer intent in circumstances similar to those in which California has applied the doctrine. *Id.* at 191.

In fact, *Rosemond* acknowledged that a rule holding an accomplice liable for a "crime [that] is the 'natural and probable consequence' of the crime the defendant intended to abet" could act as a potential gloss on the principle the Court had espoused in the case before it—specifically, that to be convicted as an accomplice to a § 924(c) offense, a defendant needs to know in advance that his confederate in the predicate crime possessed a gun. *Rosemond*, 572 U.S. at 76 n.7. The Court, however, expressed no view on this matter, noting that the question was not implicated in *Rosemond* "because no one contends that a § 924(c) violation is a natural and probable consequence of simple drug trafficking." *Id*. And certainly

63

on the facts of *Rosemond*, which involved the sale of a relatively small quantity of marijuana, that observation rings true.[15]  But the facts in *Cash* much more readily suggest that Cash's intent to use a deadly weapon was not just foreseeable, but quite likely:  that is, a natural and probable consequence.

Defendant does not disagree that "a natural and probable consequence" standard can be compatible with generic accomplice liability.  He simply thinks that *Cash* stretched that test beyond its proper bounds on the facts before the court in that case.  He argues that the evidence in *Cash* was not overwhelming enough to transform reasonable foreseeability into something akin to knowledge of the perpetrator's intended actions.[16]  The parties have not briefed the line-drawing that one should do in distinguishing between reasonable foreseeability, natural and probable consequences, and implied intent or knowledge.  But we will assume without deciding Defendant's point that, conceptually, the "natural and probable consequences" test may call for a greater level of awareness than does a "reasonably foreseeable" test.

---

[15]  The drug deal involved the sale of one pound of marijuana, a quantity that under the Sentencing Guidelines yields the lowest possible offense level:  Level 6.

[16]  The Georgia pattern instructions do not specify how one can discern knowledge, but they do provide language concerning the determination of intent, which the instruction indicates may be inferred from "the proven circumstances or by acts and conduct" or "when it is the natural and necessary consequence of the act."  Georgia Suggested Pattern Jury Instructions – Criminal, *1.41.10 Intent* (4th Ed. 2021).  Further, the jury may find intent, or the absence of it, based on "words, conduct, demeanor, motive, and other circumstances connected with the act for which the accused is being prosecuted."  *Id.* at *1.41.11*.

64

If that is so, then the language at issue in *Cash* is arguably at odds with the Supreme Court's pronouncement in *Rosemond*. Yet, even with that assumption, it is not crystal clear that the statement in *Cash*—which addressed a refusal to give a lesser-included charge, not the appropriate language to use in instructing a jury on accomplice liability for an aggravated assault—by itself transformed Georgia into a jurisdiction whose standard for conviction as an accomplice to aggravated assault is inconsistent with the requirements set out for a comparable compound crime in *Rosemond*. As far as we can tell, nothing prior to *Cash* had allowed a conviction for aggravated assault where the accomplice's intent went to only the first predicate crime of the two-pronged criminal offense. As noted earlier, Georgia law consistently speaks of the need for a common criminal intent. And since *Cash*, the Georgia Supreme Court has issued two opinions concerning aggravated assault that are consistent with that principle. *See Worthen v. State*, 306 Ga. 600, 602–03 (2019) (although a "defendant need not personally possess a weapon or fire a shot to be found guilty as a party to an aggravated assault . . . the jury could find him guilty as a party to the shooting, and thus to aggravated assault and felony murder, if the evidence showed either that he intentionally aided or abetted Armstrong in the commission of the shooting of Parrish or that he intentionally advised, encouraged, hired, counseled, or procured Armstrong to shoot Parris." (emphasis added)); *Dublin v. State*, 302 Ga. 60, 65 (2017) (same).

65

But there is a substantial caveat to the above observation based on an opinion issued a year after *Cash*:  *Herrington v. State,* 300 Ga. 149 (2016).  In that case, the Georgia Supreme Court affirmed an aggravated assault conviction against a defendant as a party to the crime, rejecting the defendant's sufficiency-of-the evidence argument that he could not be convicted because he didn't fire a shot.  *Id.* 150.  The evidence in *Herrington* clearly established that the defendant knew full well that his partner was armed with a gun because, with the partner brandishing that gun, the two stormed a truck; hauled out at gun point the two men in the truck; jointly tried to rob the men; and when that went nowhere, the defendant held one man, pushing his shirt over his face so he couldn't see, while his partner shot and killed the other man.  These facts would give the *Rosemond* court no pause:  the defendant clearly knew in advance that his partner would be using a gun to facilitate their common goal of assaulting and robbing the two men.  Yet, even though actual knowledge by the defendant was established and nothing more needed to be shown to affirm, the Georgia Supreme Court in *Herrington* nonetheless gave a nod to *Cash*, citing the case and including in a parenthetical the quote from *Cash* that the Defendant in our case has claimed renders Georgia accomplice law non-generic when applied to aggravated assault.  And even if gratuitous, the reference was made by the Georgia Supreme Court and cannot be ignored.

66

In short, we will assume that with respect to aggravated assault offenses Georgia has adopted a reasonable foreseeability test that looks to whether, on the facts known to him, the accomplice to an assault could reasonably foresee that his partner would use a deadly weapon in executing the planned assault. We will further assume that, as applied in *Cash*, Georgia's reasonable foreseeability standard calls for a less rigorous *mens rea* standard than would a "natural and probable consequences" test—albeit this is an assumption that is quite debatable. If the above assumptions are accepted, accomplice liability for Georgia aggravated assault would fall short of a generic test for such liability, as set out in *Duenas-Alvarez* and *Rosemond*.

Yet, even assuming Georgia caselaw has endorsed a non-generic accomplice standard for an aggravated assault offense, that does not mean Georgia caselaw calls for the application of a non-generic standard to burglary offenses, and burglary is the offense we are dealing with in this case. Indeed, Defendant has failed to cite any case in which a non-generic aiding-and-abetting standard has been applied to a burglary offense. And it is not surprising that Defendant would be unable to find such a case, because, for our purposes here, a burglary offense is a very different type of crime than is aggravated assault. As discussed above, in *Rosemond*, Justice Kagan acknowledged the disagreement among courts concerning the appropriate *mens rea* necessary for what she referred to as a

67

"compound," "double-barreled" offense like § 924(c), in which commission of one crime is the required predicate for conviction on an additional separate crime, with the second crime serving to enhance the penalty for the first crime. *Rosemond*, 572 U.S. at 69–71. Writing for the majority, she concluded that conviction for the "enhanced" § 924(c) offense required more than just participation in the predicate offense; it also required an intent to involve oneself in the second, "aggravating" offense, which for § 924(c) meant knowledge that a firearm would be involved. *Id.* at 77–78. We have discussed above the application of the *Rosemond* standard to a Georgia aggravated assault conviction, which like § 924(c) is a compound offense.

The analysis applied in *Rosemond,* however, simply does not track with a Georgia burglary offense. Making all assumptions in Defendant's favor, *Cash* left open the possibility that a defendant in a compound-crime case could be convicted of that crime even if he intended to commit only the predicate crime: something potentially verboten under *Rosemond*. Yet, *Cash* never indicated that intent could be dispensed with in the predicate crime itself. And for a burglary offense, burglary is the predicate and only crime. Nor does *Cash* disturb the well-settled Georgia principle in non-compound cases that a jury must acquit if it concludes that the defendant had no knowledge that a crime was being committed or if his participation in the crime was not knowing or intentional. *See, e.g.*, *Bullard*, 263 Ga. at 684, 686. *Cash* likewise does not undermine the consistent Georgia caselaw

68

refrain requiring an accomplice to share a common criminal intent with the actual perpetrators.  *See, e.g.*, *Eckman*, 274 Ga. at 65.

In short, Defendant has failed to establish a realistic probability that party-to-a-crime liability under the Georgia burglary statute extends significantly beyond liability under a generic accomplice liability standard, meaning that his Georgia burglary statute counts as one of the three predicate crimes necessary to invoke a sentencing enhancement under the ACCA.  Accordingly, we affirm the district court's imposition of that enhancement.

## III.    Acceptance of Responsibility

### A.    Defendant's Obstruction of Justice and Guilty Pleas

As noted above, the district court followed the PSR's recommendation and denied Defendant's request for an acceptance-of-responsibility reduction under U.S.S.G. § 3E1.1, despite his guilty plea, because Defendant obstructed justice. The facts of Defendant's obstructive conduct are not disputed.  On January 20, 2017, deputies in Wilkinson County, Georgia, arrested Defendant on state weapons and drug charges.  Defendant was housed in the Wilkinson County jail with Devin Bloodworth, the same CI who had assisted in the investigation that led to Defendant's arrest.  While acting as a CI, Bloodworth had purchased methamphetamine and firearms from Defendant.  On May 11, 2017, while still in state custody, Defendant struck Bloodworth in the head with his fist in an attempt

to influence Bloodworth's testimony.  Defendant was charged with aggravated assault under Georgia law and subsequently pled guilty to reduced charges of battery and influencing a witness in Wilkinson County Superior Court.

On November 16, 2017, a grand jury in the United States District Court for the Middle District of Georgia indicted Defendant for the offense of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  The charged conduct stemmed from the same incident for which Wilkinson County officials had originally arrested Defendant.  Defendant entered a not-guilty plea at his arraignment and began preparation for trial.

Defendant first filed a request for discovery, which the Government provided on December 14, 2017.  Thereafter, Defendant twice moved the district court for a continuance because "defense counsel needs additional time to review discovery, conduct and complete defense investigations, to prepare and file pretrial motions, and to discuss a possible plea resolution."  After several months of trial preparation, on March 22, 2018, Defendant changed his plea and, without the benefit of a plea agreement, pled guilty to the federal charge.

The PSR recommended a two-level enhancement for obstruction of justice based on Defendant assaulting Bloodworth to influence his testimony.  It further recommended that Defendant not be granted a reduction for acceptance of responsibility, given this obstruction of justice.  Defendant filed an objection to

70

this particular recommendation, arguing, among other things, that he should not be denied a reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1 because "the assaultive conduct toward Bloodworth happened before defendant was indicted federally."

At sentencing, Defendant did not dispute the facts describing his obstructive conduct or dispute that enhancement. He did continue to object to being denied a reduction for acceptance of responsibility. Section 3E1.1 Application Note 4 provides, in essence, that a defendant who has received an enhancement for obstruction of justice is not "ordinarily" eligible for a reduction based on acceptance of responsibility, but it notes that there may be "extraordinary cases" in which both adjustments should apply. Defendant argued that his case was "exceptional" because the obstructive conduct occurred before the indictment and because he informed the Government very early in the case that he was going to plead guilty, thereby saving the Government unnecessary trial preparations.

The district court overruled Defendant's objections and sentenced him to 235 months imprisonment, which was the low end of the Guidelines' range. With respect to acceptance of responsibility, the district court rejected Defendant's argument that his case was extraordinary because obstruction occurred before indictment, stating "[t]here's nothing in the guidelines that suggests that the Indictment is the critical point in determining 'acceptance of responsibility.'"

71

B.    **The Record Does Not Clearly Establish that this Is an Extraordinary Case Requiring an Offense Level Reduction for Acceptance of Responsibility Despite Defendant's Obstruction of Justice**

Defendant appeals the district court's refusal to give him a three-point reduction for acceptance of responsibility, arguing that his is an extraordinary case in which a downward adjustment is warranted even though Defendant obstructed justice.  "In reviewing a district court's refusal to grant a reduction under § 3E1.1, this Court reviews its interpretation of the Guidelines de novo."  *United States v. Mathews*, 874 F.3d 698, 709, n.7 (11th Cir. 2017) (citing *United States v. Coe*, 79 F.3d 126, 127 (11th Cir. 1996)).  We review the factual findings upon which the denial of the acceptance reduction is based for clear error.  *Id.* (citing *United States v. Moriarty*, 429 F.3d 1012, 1022–23 (11th Cir. 2005)).  "Defendants who plead guilty are not entitled to a § 3E1.1 reduction as a matter of right, and the district court's determination on whether to grant the reduction is entitled to 'great deference.'"  *Id*. (citing U.S.S.G. § 3E1.1 cmt. n.3 & n.5).

Section 3E1.1 of the Sentencing Guidelines provides for a downward adjustment to a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  U.S.S.G. § 3E1.1; *United States v. Sawyer*, 180 F.3d 1319, 1323 (11th Cir. 1999) (noting that "the defendant bears the burden of clearly demonstrating acceptance of responsibility").  A defendant's guilty plea before trial combined with truthful admissions regarding his conduct

72

constitutes significant evidence of acceptance of responsibility.  U.S.S.G. § 3E1.1

cmt. n.3.  However, Application Note 4 to U.S.S.G. §3E1.1, states:

> Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply.

U.S.S.G. § 3E1.1 cmt. n.4.  Accordingly, Defendant's admitted obstruction of

justice precludes a reduction for acceptance of responsibility absent

"extraordinary" circumstances.

When challenging a district court's decision whether to award a reduction

for acceptance of responsibility, a party has something of an uphill climb.  As

noted above, the party—whether it be the Government or the defendant—must

show that the district court clearly erred.  Plus, when we review that decision, we

are expected to give "great deference" to that court's judgment.  Further, "[t]he

determination of whether a defendant has adequately manifested acceptance of

responsibility is a flexible, fact sensitive inquiry."  *United States v. Smith*, 127 F.3d

987, 989 (11th Cir. 1997) (en banc).  Applying those standards, the record here

does not clearly establish that the district court was wrong when it rejected

Defendant's argument that this was an "extraordinary" case warranting an

adjustment both for obstruction of justice and acceptance of responsibility.

Defendant points to his guilty plea as evidencing his acceptance of responsibility despite his earlier obstructive conduct. But Defendant "must present more than just a guilty plea" to establish acceptance of responsibility. *United States v. Wright*, 862 F.3d 1265, 1279 (11th Cir. 2017) (quoting *Sawyer*, 180 F.3d at 1323). That is especially true when Defendant has engaged in obstruction of justice, and even more so when, as here, the obstructive act was a violent assault of a key witness.

Likewise, we are unpersuaded by Defendant's argument that this is an extraordinary case warranting a downward adjustment because Defendant's obstructive conduct preceded the federal indictment. We agree with the district court that the Guidelines clearly contemplate pre-indictment obstruction of justice as a strong factor precluding an acceptance-of-responsibility reduction. *See* U.S.S.G. §§ 3C1.1 cmt. n.1 (defining obstruction as including conduct during an investigation or before the start of an investigation if "conduct was purposefully calculated, and likely, to thwart the investigation") and 3E1.1 cmt. n.4 (referring generally to obstruction of justice under § 3C1.1). Neither the Guidelines nor the Application Notes distinguish between pre- or post-indictment obstruction of justice when considering the ramifications of that conduct. Here, Defendant assaulted the CI four months after the former's arrest. The essence of Defendant's argument is that his case would have been less extraordinary had federal

authorities moved more quickly and gotten him indicted during that four- month period of time. But the speed by which the federal authorities moved seems to be an arbitrary and inapt factor in determining whether Defendant's case was extraordinary. Defendant's argument also does not account for the violent nature of his obstructive conduct. While a one-time occurrence, this was not a minor incident.

Accordingly, the district court's judgment on this matter is entitled to great deference, and we cannot say that the court clearly erred in its decision to deny Defendant a reduction for acceptance of responsibility.

## CONCLUSION

Although the district court erred under *Rehaif* in failing to ensure that Defendant understood the knowledge-of-status element of his 18 U.S.C. § 922(g)(1) charge before he pled guilty, we affirm Defendant's conviction because the error caused no prejudice and did not affect Defendant's substantial rights. We also affirm Defendant's sentence because the district court correctly concluded that Defendant was subject to an ACCA enhancement based on his prior convictions. Finally, the district court did not clearly err in declining to award Defendant a reduction for acceptance of responsibility.

**AFFIRMED.**